IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KARA LEIGH SHIPP,                    :
                                     :
        Plaintiff,                   :
                                     :
v.                                   :        CIVIL ACTION FILE NO.
                                     :        1:12-CV-0374-AJB
CAROLYN W. COLVIN,                   :
*Acting Commissioner of*             :
*Social Security*,                   :
                                     :
        Defendant.                   :

## ORDER AND OPINION[1]

This matter is before the Court on Defendant's Motion to Alter or Amend

Judgment under Rule 59(e) of the Federal Rules of Civil Procedure. [Doc. 16]. For the

reasons set forth below, the motion is **GRANTED**.

## I.    PROCEDURAL HISTORY

Plaintiff Kara Leigh Shipp ("Plaintiff") filed applications for federal Disability

Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") on

_____

        [1]    The parties have consented to the exercise of jurisdiction by the
undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil
Procedure. (*See* Dkt. Entries, Nov. 26, 2012). Therefore, this Order constitutes a final
Order of the Court.

AO 72A
(Rev.8/8
2)

December 30, 2009, alleging disability commencing on September 23, 2009.[2]
[Record (hereinafter "R") 107-14].  She claimed that learning disabilities and attention
deficit hyperactivity disorder ("ADHD") limited her ability to work.  [R139].
Plaintiff's applications were denied initially and on reconsideration.
[*See* R49-52, 56-59].  Plaintiff then requested a hearing before an Administrative Law
Judge ("ALJ").  [R60-66].  An evidentiary hearing was held before the ALJ on
June 20, 2011.  [R23-42].  The ALJ issued a decision on August 16, 2011, denying
Plaintiff's applications on the ground that she had not been under a "disability" at any
time from the claimed disability onset date through the date of the decision.  [R7-19].
Plaintiff sought review by the Appeals Council, and the Appeals Council denied

---

[2]         Title II of the Social Security Act provides for federal Disability Insurance
Benefits.  42 U.S.C. § 401 *et seq.*   Title XVI of the Social Security Act,
42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income Benefits for the
disabled.  Title XVI claims are not tied to the attainment of a particular period of
insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).
The relevant law and regulations governing the determination of disability under a
claim for DIB are nearly identical to those governing the determination under a claim
for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing
*McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).
Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully
applicable to claims for SSI.  Therefore, although different statutes and regulations
apply to each type of claim, in general, the legal standards to be applied are the same
regardless of whether a claimant seeks DIB, to establish a "period of disability," or to
recover SSI.  Consequently, to the extent that the Court cites to SSI cases, statutes, or
regulations, they are equally applicable to Plaintiff's DIB claims.

2

Plaintiff's request for review on December 13, 2011, making the ALJ's decision the final decision of the Commissioner.  [R1-5].

Plaintiff then filed a civil action in this Court on February 3, 2012, seeking review of the Commissioner's final decision pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3). [Doc. 3].  The answer and transcript were filed on August 1, 2012. [*See* Docs. 6-7].  On August 31, 2012, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 9], on October 1, 2012, the Commissioner filed a response in support of the decision, [Doc. 10], and on October 15, 2012, Plaintiff filed a reply brief, [Doc. 11].  On November 21, 2012, Plaintiff filed a motion to proceed without oral argument, which the Court granted on November 26, 2012.  (*See* Dkt. Entries, Nov. 21, 2012).  On August 28, 2013, the Court issued an Order reversing the final decision of the Commissioner and remanding the case for further proceedings. [Doc. 14].  The Clerk entered judgment the same day.  [Doc. 15].

On September 6, 2013, the Commissioner filed the Motion to Alter or Amend Judgment that is now before the Court.   [Doc. 16].   The Commissioner seeks reconsideration of the portion of the Court's Order that held that the ALJ erred by failing to procure a consultative examination from a treating medical source and instead

3

relying on a non-treating source to conduct the examination.[3]  [*Id*.].  Plaintiff did not file a response to the motion.  [*See* Dkt.].

On October 28, 2013, Plaintiff filed a motion for an award of attorneys' fees under the  under the Equal Access to Justice Act ("EAJA") as the prevailing party.[4] [Doc. 17].  On November 12, 2013, the Court granted the Commissioner's unopposed motion to stay the deadline for filing a response to the motion for attorneys' fees, pending the Court's decision on her motion to alter or amend.  (*See* Dkt. Entries, Nov. 12, 2013).

## II.    STATEMENT OF FACTS

### A.    *Administrative Records*

Plaintiff was twenty-four years old on the alleged onset date of September 23, 2009.  [*See* R107].  In an undated Adult Disability Report, Plaintiff reported completing the twelfth grade in 2009 and stated that she did not attend special education classes.  [R140].  She stated that she also had vocational training in office

---

[3]    The Commissioner did not seek reconsideration of the other ground for reversal: that the ALJ had failed to consider evidence adverse to his determination that Plaintiff "had no problems in class" and "was doing well on medication."  [*Compare* Doc. 14 at 45-46, 49-51 *with* Doc. 16, *passim*].

[4]    In the motion for attorneys' fees, Plaintiff acknowledged that the Commissioner's motion was pending.  [Doc. 17 at 2].

administration but that learning disabilities and ADHD prevent her from working. [R139-40]. She reported past work as a clerk support specialist, a server/cashier, and a teacher's assistant. [R141]. She indicated that she had been visiting the Atlanta Job Corps Center since April 2009 for behavioral health and learning disabilities and had received medication and counseling there. [R143-44]. She also reported having received medication and counseling at Kaiser Permanente / Southwood Medical Center from 2005 through 2007 for behavioral health and learning disabilities. [R144].

In a third-party Adult Function Report dated February 4, 2010, Plaintiff's grandmother reported that Plaintiff's daily activities consisted of brushing her teeth, washing her face, doing her hair, getting her books ready for school, going to school, and coming home. [R167]. She stated that Plaintiff did not take care of pets or any other people and that Plaintiff had no problems with personal care. [R168]. She reported that Plaintiff had suffered from her disabling conditions all her life. [R168]. She stated that family would remind Plaintiff to take her medicine and make Plaintiff's meals for her. [R169]. She indicated that with encouragement, Plaintiff would clean her room, wash dishes, and take out the trash once a week. [R169]. She reported that although Plaintiff rarely went out (except for going to school every day), she could go out alone and would travel by using public transportation or riding in a car but could

AO 72A
(Rev.8/8
2)

not drive.  [R170-71].  She stated that Plaintiff would go shopping in stores to buy clothes and shoes on trips that would take about two hours.  [R170].  According to her grandmother, Plaintiff could count change, handle a savings account, and use a checkbook but could not pay bills.  [R170].  She stated that Plaintiff's hobbies were watching television and talking on the phone and that she would do these things all day. [R171].  She indicated that Plaintiff would have problems getting along with other people "because she doesn't like to listen" and that Plaintiff also had difficulties with memory, completing tasks, concentration, understanding, following instructions, maintaining attention, getting along with authority figures, handling stress and changes in routine, and using her hands.  [R172-73].  She also stated that she noticed "unusual behavior or fears" in Plaintiff but did not explain what she meant.  [R173].

In an undated Disability Report - Appeal, Plaintiff reported that in January 2010, she became more depressed, sad, irritated, and hopeless.  [R182].  She stated that her energy was low but that it was difficult to sit still.  [R182].  She indicated that since January 2010, she had been receiving examinations, medication, and counseling for

AO 72A
(Rev.8/8
2)

bipolar disorder,[5] depression, insomnia, irritability, and ADHD, and that she was taking Ritalin[6] for ADHD and Risperdal[7] for depression.  [R183-84].

In a third-party Adult Function Report dated September 21, 2010, Plaintiff's grandmother reported several changes in Plaintiff's condition.  She indicated that Plaintiff's legs were weak and shaking and that she was staying in bed most of the day and sleeping.  [R187].  She also stated that Plaintiff had begun suffering from bipolar disorder and was still having trouble concentrating.  [R187-88].  She reported that Plaintiff was not sleeping well at night and had a tendency to forget to brush her teeth.

---

[5]    Bipolar disorder is also known as manic-depressive illness and is "a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks."  Nat'l Inst. of Mental Health, http://www.nimh.nih.gov/health/publications/bipolar-disorder/index.shtml  (Bipolar Disorder) (last visited 3/26/14).

[6]    Ritalin is a brand name for methylphenidate, a central-nervous-system stimulant used to treat ADHD in adults and children.  MedlinePlus, http:/www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html (Methylphenidate) (last visited 3/26/14).  Plaintiff and her physicians interchangeably used the drug's generic and brand names.  For clarity, the Court uses only the brand name.

[7]    Risperdal is a brand name for risperidone, one of a class of medications known as atypical antipsychotics.  It is typically prescribed to treat symptoms of schizophrenia, bipolar disorder, and behavior problems, such as aggression, self-injury, and sudden mood changes.  MedlinePlus, http:/www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html  (Risperidone) (last visited 3/26/14).

7

[R188].  She indicated that Plaintiff would go out about once a week with a group of people and would either walk or use public transportation because she did not have a driver's license.  [R193].  She reported that Plaintiff could go shopping, count change, and pay bills.  [R193].  She stated that Plaintiff's hobbies were watching television, listening to music, and talking on the phone, and that she would visit "social groups" regularly.  [R194].

### B.    Medical Records

In June 2007, Plaintiff reported on a Paine College disability services intake form that she had a 0.5 grade point average and was taking Ritalin for ADHD.  [R361].  In a letter dated August 9, 2007, Roscoe Williams, Paine College's Acting Coordinator of Disability Services, advised one of Plaintiff's professors that Plaintiff had a learning disability (ADHD) that qualified her for special assistance.  [R353; *see also* R345 (similar letter dated Sept. 19, 2007)].  The letter stated that the psychologist who made the learning-disability determination recommended the following accommodations: use of a tape recorder to tape lectures; extra time on tests and quizzes; and periodic individual conferences.  [R345, 353].

Kaiser Permanente treatment notes dated October 7, 2008, indicate that Plaintiff had been prescribed Ritalin since at least April 16, 2008.  [R215-17].

8

A Diagnostic Assessment Form from Grady Health System's Central Fulton Community Mental Health Center signed by Dr. Brandon Kohrt, M.D., Psychiatry, and dated January 18, 2010, indicates concerns over Plaintiff's depressed and uncooperative behavior at home. [R221]. Plaintiff admitted increased depressed mood after a miscarriage and the death of her grandfather. [R221]. She endorsed depressed mood, anhedonia,[8] insomnia, decreased appetite, increased distractibility, and decreased energy. [R221]. She exhibited increased risk-taking behavior, including binge drinking and using marijuana. [R221]. Her insight was judged to be fair and her judgment was noted to be poor. [R238]. She was diagnosed with ADHD and Bipolar Disorder II[9] and assigned a GAF score of 55.[10] [R239]. She did not meet the criteria

---

[8]     Anhedonia is the inability to derive pleasure from most activities. *See* Anxiety Disorders Association of America, Depression, http://www.adaa.org/understanding-anxiety/depression (last visited 3/26/14).

[9]     Bipolar II Disorder "is defined by a pattern of depressive episodes shifting back and forth with hypomanic episodes, but no full-blown manic or mixed episodes." Nat'l Inst. of Mental Health, http://www.nimh.nih.gov/health/publications/bipolar-disorder/index.shtml (Bipolar Disorder) (last visited 3/26/14).

[10]    The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR"). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and

for involuntary admission, but she was offered inpatient voluntary admission, which she refused.  [R221].  She was started on Risperdal and was to follow up with outpatient mental health treatment.  [R221].

The next day, on January 19, 2010, Plaintiff was seen for a diagnostic assessment at Grady's Central Fulton Community Mental Health Center.  [R222].  Notes indicate that Plaintiff was sent for evaluation because she had been staying out for one to several nights at a time.  [R222].  Plaintiff also admitted to smoking marijuana two to three times per week.  [R222].  She reported that had been diagnosed with ADHD in childhood, had been and continued to be treated with twice-daily doses of Ritalin, and had no other history of mental illness.  [R222].  Plaintiff also stated that she was in college, had been raised by her grandparents, and was still grieving over her grandfather's death the prior year. [R223].  She was diagnosed with ADHD and THC[11] abuse, her grief over her grandfather was noted, and she was assigned a GAF score

_____

circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34.

[11]    Tetrahydrocannabinol ("THC") is the main psychoactive ingredient in marijuana.  NIH Nat'l Inst. on Drug Abuse, The Science of Drug Abuse & Addiction, http://www.drugabuse.gov/publications/topics-in-brief/marijuana (Topics in Brief: Marijuana) (last visited 3/26/14).

AO 72A
(Rev.8/8
2)

of 75, with an estimated high of 80[12] in the past year.  [R224].  It was also noted that the previous day Plaintiff had been given a prescription for Risperdal for possible bipolar disorder.  [R225].

A Behavioral Health Assessment also dated January 19, 2010, stated that Plaintiff had grandiose delusions, depressed mood, sadness, agitation, irritability, euphoria, poor impulse control, reduced appetite and energy level, disrupted sleep, and ADHD. [R226-27].  The report also stated that Plaintiff abused alcohol and marijuana, had been running away, was sexually promiscuous, and had visual hallucinations when smoking marijuana.  [R226].  Plaintiff reported that she is able to care for herself but needs assistance sometimes with her finances.  [R229].  Needs identified were medication management and counseling.  [R229].

A Nursing Assessment also from January 19, 2010, indicates that the psychiatric diagnosis and chief complaint was bipolar disorder.  [R230].  The assessment noted Plaintiff's reported substance abuse but indicated that she had no significant problems preventing her from participating in activities of daily living.  [R230-31].

_____

[12]     A GAF score in the range of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  DSM-IV-TR at 34.

A Service Plan Development report from January 19, 2010, signed by Desheca Smith, L.A.P.C., set goals of stabilizing moods by taking medication daily for the next ninety days and participating in counseling, and eliminating or reducing substance use by refraining from using any drugs or alcohol for the next thirty days. [R232]. Plaintiff's problems were noted to be mood instability (depression), alcohol and marijuana use, medication management, counseling services, grief issues, risky behavior, and prostitution. [R232-33]. She was also noted to have a deficit in coping skills. [R232].

Plaintiff followed up with Ms. Smith for individual counseling on January 28, 2010. [R234]. She had not used marijuana or drunk alcohol since January 19, 2010, and she was to work on using alternative coping skills in order to control anger. [R234]. Diagnoses were ADHD and Bipolar Disorder, mixed II. [R235]. Plaintiff's GAF score was 55. [R235]. She was directed to continue taking Ritalin and was prescribed Risperdal. [R236].

Plaintiff again followed up with individual counseling with Ms. Smith at Grady's Central Fulton Community Mental Health Center on February 18, 2010. [R249]. Plaintiff reported that after she had been stood up for Valentine's Day, she and a friend got high and drunk. [R249].

12

On April 6, 2010, Plaintiff underwent a consultative psychological evaluation by Melanie M. Echols, Ph.D., Licensed Psychologist.  [R272-77].  Dr. Echols noted that Plaintiff's alleged impairments included learning disability, ADHD, and severe bipolar disorder, but that Plaintiff denied a history of anger, depression, or sleep disturbances. [R272, 276].  Plaintiff reported that her current medications were Ritalin for ADHD and Risperdal for bipolar disorder.  [R273].  Plaintiff also admitted to drinking and using marijuana on the weekends.  [R273].  Although Plaintiff was at the time a full-time student at Bauder College, [R272], academic subtests on the Wechsler Adult Intelligence Scale – 4th Edition revealed a reading grade equivalent of 4.4 and an arithmetic grade equivalent of 6.1, [R276].  Testing also revealed cognitive scores in the Borderline to Low Average ranges, academic scores in the Borderline to Low Average ranges, and a visual spatial skill score in the Borderline range.  [R275, 277]. Dr. Echols's diagnostic impression was Bereavement, Rule Out Depressive Disorder – Not Otherwise Specified, and Cannabis Abuse.  [R276].  Dr. Echols opined that based on the information provided, Plaintiff did not meet the criteria for bipolar disorder, but that her mood state was likely contributing to rebellious behavior. [R276]. Dr. Echols did not see impediments to obtaining and maintaining employment other

13

than Plaintiff's full-time college student status, her lack of transportation, and the possibility that her drug or alcohol use might increase.  [R277].

A Mental Residual Functional Capacity Assessment completed by nonexamining state agency review physician Arleen Turzo, Ph.D., on May 19, 2010, indicated moderate limitations in the abilities to understand and remember detailed instructions and carry out detailed instructions.  [R278-80].  In a functional capacity assessment, Dr. Turzo found that Plaintiff's social and adaptation skills appeared to be intact and would not cause substantial limitations.  [R280].  As to understanding and memory, and concentration, persistence, and pace, Dr. Turzo found that Plaintiff could understand and remember simple tasks and would not be substantially limited, but that she would likely have episodic difficulty with detailed tasks.  [R280].  Dr. Turzo also completed a Psychiatric Review Technique form indicating the presence of Organic Mental Disorders, Affective Disorders, and Substance Addiction Disorders.  [R282].  She also opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace.  [R292].

In a letter dated May 24, 2010, handwritten on Grady Health System letterhead and addressed to "Whom It May Concern," a medical doctor by the name of D.E. Cosby verified that Plaintiff had been diagnosed with ADHD in childhood and had

14

also been diagnosed with Bipolar Disorder II.  [R369].  The letter also noted that Plaintiff was taking Risperdal and Ritalin at the time.  [R369].

A Grady Health Care System gynecologist record dated May 26, 2010, indicated that Plaintiff came in for a pill refill.  [R245].  Plaintiff's diagnoses of bipolar disorder and ADHD were noted, and Plaintiff denied having any problems.  [R245].

In a letter dated May 26, 2010, Dr. Walter Dean, a disability-services counselor at Paine College, advised Plaintiff's professors that Plaintiff had a learning disability (ADHD/Bipolar II) that qualified her for special assistance.  [R346, *see also* similar letters at R206 (Aug. 16, 2010), R344 (Oct. 6, 2010), R205 (Jan. 12, 2011)].  The letter stated that the psychologist who made the learning-disability determination recommended the following accommodations: use of a tape recorder to tape lectures; extra time on tests and quizzes; tutoring with both teachers and tutoring centers; counseling with the Counseling and Wellness Center; and periodic individual conferences.  [R205, 206, 344, 346].

An August 23, 2010, annual review from Paine College signed by Dr. Dean indicates that Plaintiff received treatment that summer for ADHD and bipolar disorder. [R207].  Her progress was rated "good," and Dr. Dean recommended that she continue to receive the same five student accommodations.  [R207].

15

In October 2010, Plaintiff came to the counseling office in distress because time constraints on a mid-term exam required that she turn in the examination without having the opportunity to review her work. [R350]. She was seen by Janice B. Moore, Counselor. [R350]. She received a failing grade on the examination, and the professor indicated that Plaintiff had not told him that she had been unable to finish and needed more time. [R351]. The professor and Ms. Moore agreed that Plaintiff would be given additional time on future assignments. [R352].

In November 2010, Plaintiff expressed confusion over a presentation she had been assigned at the beginning of the term. [R347-49]. After consultation with Ms. Moore, Plaintiff was given additional time to complete the project. [R347].

Paine College Counseling and Wellness Center progress notes signed by Tiffany Williams, M.Ed., M.S., L.A.P.C., and dated January 12, 2011, state that Plaintiff reported that she was not having any problems in class and that she would be starting work again the next week at her part-time job. [R331]. Plaintiff and Ms. Williams discussed Plaintiff's ideas about having an alcohol-awareness forum that April and Plaintiff's desire to improve her GPA so that she could join the Student Government Association in the near future. [R331].

AO 72A
(Rev.8/8
2)

Paine College Counseling and Wellness Center progress notes signed by Ms. Williams and dated April 21, 2011, indicate that Plaintiff was anxious; she was out of her medication for bipolar disorder and was fearful of how she might feel in a few days without it.  [R332].  She was advised to go to the University Hospital Emergency Room in an effort to get evaluated and obtain a prescription, but there was no emergency-room psychologist.   [R332].   Ms. Williams's progress notes dated April 27, 2011, indicate that Plaintiff missed class to go home that Friday so that she could be evaluated by a psychologist there and receive new prescriptions.  [R333].  The notes also indicate that Plaintiff and Ms. Williams discussed the upcoming alcohol-awareness forum for which Plaintiff had volunteered.  [R333].

A Counseling and Wellness Center progress note signed by Ms. Williams and dated May 4, 2011, indicated that Plaintiff was "a bit anxious, yet pleasant."  [R335]. She stated that she was doing "okay so far," but was greatly concerned about her Atmospheric Science class.  [R335].  She indicated that she did not understand the material and was overwhelmed by the amount of information the final examination would cover.  [R335].  She also indicated that the professor did not believe she had a learning disability because she was "one of his best students" but that she had not passed any of his tests since the beginning of the school year.  [R336].

17

On May 6, 2011, Plaintiff met with Ms. Williams, her Atmospheric Science professor, and the Interim Associate Vice President of Academic Affairs to discuss struggles with reading and comprehending chapters that she would be tested on in the Atmospheric Science class.  [R334].  She also stated that she had failed every test thus far.  [R334].  The professor reported that although he offered to meet with Plaintiff to discuss her grades and missed assignments, she did not follow through, and that she missed many classes, was extremely late for the final review class, and turned in lab reports that were incomplete or "not on task."  [R334].

On June 13, 2011, Plaintiff called Ms. Williams at Paine College to inform her that she would not be returning to the college for financial reasons and instead was enrolling at a school she attended before transferring to Paine.  [R327].

### C.      *Evidentiary Hearing Testimony*

At the hearing held on June 20, 2011, the ALJ heard testimony from Plaintiff and from a vocational expert ("VE").  [R23].  Plaintiff was represented by an attorney. [R25].

### 1.      *Plaintiff's Testimony*

Plaintiff testified that she graduated from high school via Job Corps, had attended Paine College, and was presently attending Bauder College full time, where she was a

18

junior majoring in business administration and management and was "about a C average student." [R29, 31-32]. She stated that because she has trouble with her memory and ability to concentrate, her school provides accommodations for her, including extra time on tests, the opportunity to tape-record class lectures, and tutoring. [R31-32]. She indicated that she had difficulty remembering when to do homework and projects and, as a result, often did them at the last minute. [R32].

Plaintiff stated that before September 2009, she worked in daycare and as a restaurant server and then for Fulton County as a clerk support specialist, where she typed information into a land-based computer system and verified and indexed documents. [R30]. She testified that she worked for Fulton County for about a year and was "constantly" in her manager's office because her memory difficulties would cause her to make mistakes. [R32-33]. She stated that she left her job with Fulton County to go to Atlanta Job Corps, where she received training and earned a high-school diploma. [R33]. She indicated that since September 2009, her only work had been a seasonal holiday job for Abercrombie & Fitch that started in October 2010 and ended in February 2011. [R29-31].

Plaintiff testified that she takes Risperdal for bipolar disorder and Ritalin for ADHD and that she does not have trouble with the bipolar disorder or ADHD when she

19

takes the medication.  [R33-35].  She did report, however, that she tends to wake up for a couple of hours in the middle of the night and that she would sleep for an hour or two when she got home from school.  [R34-35].  She also indicated that if she did not eat before she took her Ritalin, she would not have any appetite that day.  [R38].

She stated that on a typical day, she would go to class, come home and nap, get up and try to remember what homework was due, and if her grandmother reminded her, she would do things like wash the dishes, clean the bathroom, clean her room, or do laundry.  [R34].  Once reminded, she could do her daily chores on her own.  [R34].  She reported getting along well with her family but having difficulty interacting with others at school because she had been away for a year and many of her friends had moved on.  [R35].

Plaintiff indicated that she had not been to a doctor since she visited Grady Memorial Hospital in October 2010 but that she had recently been added to her mother's insurance and was trying to find a doctor.  [R35-36].  She also stated that she was receiving psychiatric counseling at school two or three times per month.  [R36].  She reported that the last time she had alcohol was the previous Thursday and before that was a year ago on her birthday.  [R37].  She indicated that it had been about a month since she used marijuana.  [R37].

20

### 2.    *Vocational Expert's Testimony*

When asked about a hypothetical individual who would not be exertionally limited, but who would have non-exertional limitations including the ability to understand, remember, and carry out simple instructions only and no ability to perform fast-paced production work, the VE opined that the person could not perform Plaintiff's past work as a table server/cashier or as a general clerk but could work as a daycare assistant, a job that exists in substantial numbers in the national economy.  [R40-41]. In response to the ALJ's second query in which he asked whether such a hypothetical person who was further limited by an inability to maintain attention and concentration for two-hour periods of time had the ability to work, the vocational expert testified that such a person could not perform Plaintiff's past work or any work at all.  [R40].

## III.   ALJ'S DECISION

After Plaintiff's hearing, the ALJ issued an opinion in which he found that Plaintiff's ADHD, bereavement disorder, and bipolar disorder were severe impairments.  [R12].  He determined, however, that she had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, limited by her capability of understanding, remembering, and carrying out simple instructions only and her inability to perform fast-paced production work.  [R14].  He therefore

AO 72A
(Rev.8/8
2)

concluded that Plaintiff could perform jobs that existed in significant numbers in the national economy.  [R17].

The ALJ explained that Plaintiff had no restriction in her activities of daily living and was independent in her activities of daily living, including personal care, household chores, light meal preparation, laundry, attending school full time, and using public transportation.  [R13].  He also found that Plaintiff had no difficulties in social functioning, noting that although she testified that she had difficulty interacting with others, she got along with her family very well and liked "partying with friends" and going to the "club," and there were no indications in treatment records that Plaintiff had difficulty getting along with others in school or at the doctor's office.  [R13].  The ALJ further found that Plaintiff had experienced no extended episodes of decompensation and that there was no evidence that Plaintiff lost a job or required psychiatric hospitalization because of a mental impairment.  [R14].  The ALJ did, however, conclude that Plaintiff had moderate difficulties with concentration, persistence, or pace.  [R14].  In doing so, he explained that he was taking into consideration Plaintiff's impairments and the school accommodations she received as a result of the impairments and that he found Plaintiff's testimony claiming severe difficulties concentrating and remembering to be inconsistent with Plaintiff's academic progress

22

and the lack of objective evidence supporting substantial memory and concentration deficits.  [R14].

The ALJ further explained that although Plaintiff's impairments were fully established by objective medical evidence and she did have some problems, the objective medical evidence and opinions of the state agency psychological consultants indicated that the problems were not severe enough to be disabling.  [R15].  First, the ALJ noted that Plaintiff had a history of academic accommodations due to diagnosis of ADHD as early as 2007 but that there was no evidence of significant medical treatment through the alleged disability onset date of September 23, 2009, and the remainder of 2009.  [R15].

Second, the ALJ determined that the record shows that Plaintiff had no significant mental health treatment until January 18, 2010, when her grandmother tried to have her admitted for psychiatric treatment due to depression and frequent episodes of running away, and even then, Plaintiff did not meet involuntary admission criteria but instead was offered voluntary admission that she refused.  [R15].  He pointed to notes indicating Plaintiff's admissions that she often partied with her friends, drank alcohol, and used marijuana, and that the "primary diagnoses" were ADHD and THC abuse.  [R15].  He further explained that a GAF of 75 is "consistent with transient

23

symptoms" and that Plaintiff reported that she did not did not take medication daily and had no counseling services for the previous two years.   [R15-16].   The ALJ acknowledged that in a follow-up appointment on January 28, 2010, Plaintiff was given a GAF score of 55 and diagnosed with "bipolar mixed," but explained that there was "no active psychosocial stress" and that a GAF of 55 is "consistent with moderate limitation in functioning but does not support substantial loss of functioning."  [R16].

Third, the ALJ explained that the medical records undermined the complaints Plaintiff alleged during her hearing.  Grady treatment records from January 2010 through December 2010 did not show a substantial decrease in Plaintiff's ability to function.  [R16].  Records from Paine College Counseling and Wellness Center dated June 2007 through June 2011 showed that Plaintiff received class accommodations, had no problems in class, was doing well on medication, and assisted with counseling a class on alcohol awareness as a volunteer.  [R16].  Notes associated with Plaintiff's April 6, 2010, psychological evaluation and intelligence testing state that she denied sleeping difficulties, reported independence in personal care, household chores, and managing finances, and reported using marijuana and alcohol on the weekends.  [R16].

24

Fourth, he concluded that Plaintiff's full-scale IQ score was entitled to little weight because it was inconsistent with Plaintiff's school records and her history of semi-skilled work.  [R16].

Fifth, the ALJ explained that the assessment by Dr. Echols, the consultative psychological examiner, was given significant weight and did not support a disability finding:  Dr. Echols found that Plaintiff was alert and oriented with normal attention and concentration skills; her immediate memory appeared to be "slightly" deficient, but recent and remote memory processes were intact, her comprehension was good, and her insight and judgment were fair; the information Plaintiff provided indicated that she did not meet the criteria for bipolar disorder; and any barriers to Plaintiff's ability to obtain and maintain employment would be due to her full-time college student status, lack of transportation, or progressive use of alcohol and marijuana.  [R16].  The ALJ also noted Dr. Echols's observations that Plaintiff reported depression arising from her grandfather's death in December 2009 and her recent miscarriage; that she reported being "stressed" living in a home with five women and liked being able to party, drink, and smoke at her friend's house; and that although Plaintiff engaged in risky behaviors, she denied a history of anger, depression, or sleep disturbances.  [R16].

25

Sixth, the ALJ gave significant weight to the opinions of Dr. Turzo, the state agency psychological consultant, who upon review of Grady notes from January 2010 and review of Dr. Echols's report, determined that Plaintiff's mental impairments were "severe" but resulted in no restriction of activities of daily living or social functioning; moderate limitation in concentration, persistence, and pace; no repeated episodes of decompensation; and some but not substantial limitation in understanding and memory, sustained concentration, and persistence, social interaction, and adaptation. [R17]. He explained that Dr. Turzo's assessments were entitled to great weight because they were supported by the objective evidence. [R17].

Seventh, the ALJ found that the third-party reports made by Plaintiff's grandmother supported his finding that Plaintiff "has some problems" but was not disabled within the meaning of the Social Security Act. [R17].

Eighth, the ALJ noted the vocational expert's testimony that a person with a residual functional capacity to perform a full range of work at all exertional levels but who was limited by her capability to understand, remember, and carry out simple instructions only and by her inability to do fast-paced production work, could work as a day-care assistant, a job occurring in significant numbers in the national economy. [R17-18].

26

## IV.   LEGAL STANDARDS

### A.   *Standard for Determining Disability*

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving

27

disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11ᵗʰ Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11ᵗʰ Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can  perform  other  work  besides  past  relevant  work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant

28

has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## B.    *Scope of Judicial Review*

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980) (Murphy, J.).  This Court may not decide the facts anew, reweigh the evidence, or

AO 72A
(Rev.8/8
2)

substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary

AO 72A
(Rev.8/8
2)

of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

### C.      Motion to Alter or Amend Judgment

"The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact. . . .  A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment."  *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (per curiam) (brackets, quotations, and citations omitted); *accord Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1267 (11th Cir. 1998) (providing that a Rule 59 motion for reconsideration "should not be used to raise legal arguments which could and should have been made before the judgment was issued").

This Court's Local Rules further provide that "[m]otions for reconsideration shall not be filed as a matter of routine practice"; instead, such motions shall only be filed when "absolutely necessary."  LR 7.2E, NDGa.  "Such absolute necessity arises where there is '(1) newly discovered evidence; (2) an intervening development or change in

31

controlling law; or (3) a need to correct a clear error of law or fact.' " *United States,*
*ex rel. Powell v. Am. InterContinental Univ.*, 756 F. Supp. 2d 1374, 1377
(N.D. Ga. 2010) (Story, J.) (quoting *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258-59
(N.D. Ga. 2003) (Martin, J.)).  "An error is not 'clear and obvious' if the legal issues
are 'at least arguable.' " *Reid v. BMW of N. Am.*, 464 F. Supp. 2d 1267, 1270 (N.D. Ga.
2006) (Shoob, J.) (quoting *United States v. Battle*, 272 F. Supp. 2d 1354, 1358
(N.D. Ga. 2003) (Evans, J.)).  "[A] motion for reconsideration is not an opportunity for
the moving party . . . to instruct the court on how the court 'could have done it better'
the first time." *Powell*, 756 F. Supp. 2d at 1377 (quoting *Pres. Endangered Areas of*
*Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 916 F. Supp. 1557, 1560 (N.D. Ga.
1995) (O'Kelley, J.)).  Moreover, "a motion for reconsideration may not be used 'to
present the court with arguments already heard and dismissed or to repackage familiar
arguments to test whether the court will change its mind.' " *Powell*, *id.* (quoting *Bryan*,
246 F. Supp. 2d at 1259).  Denial of a Rule 59 motion for reconsideration is reviewed
for abuse of discretion.  *Arthur*, 500 F.3d at 1343.

## V.    DISCUSSION

In the brief she filed in support of her appeal of the ALJ's decision, Plaintiff
argued that the ALJ erred in his RFC determination because the ALJ (1) did not provide

AO 72A
(Rev.8/8
2)

a sufficiently detailed description of Plaintiff's mental impairments in formulating the RFC, (2) failed to meet his duty to develop the evidentiary record by obtaining a function-by-function opinion of limitations from a treating source, and (3) made an impermissibly broad rejection of Plaintiff's credibility that failed to take into account Plaintiff's significant difficulties in school.  [Doc. 9 at 8-15].  She further argued that the errors led the ALJ to pose an incomplete hypothetical question to the VE, thereby causing the vocational testimony to be unsupported by substantial evidence.  [*Id*. at 15-16].  The Commissioner's motion to alter or amend judgment challenges the Court's holding as to Plaintiff's second enumeration of error.  [Doc. 16].

Plaintiff had argued in her initial brief that the regulations anticipate that reasonable efforts will be made to obtain a function-by-function opinion of limitations from a treating source, [Doc. 9 at 10 (citing 20 C.F.R. § 416.913(e) (providing, among other things, that the evidence in a claimant's case record must be complete and detailed enough to allow the Commissioner to determine an adult claimant's RFC to do work-related physical and mental activities))], and require that inquiry first be made to a treating source and that only if the information is unavailable, a consultative examiner will then be asked for an opinion, [Doc. 9 at 10 (citing 20 C.F.R. § 416.912(e) (providing further that the Commissioner will not evaluate evidence from a consultative

33

examination until he has made "every reasonable effort to obtain evidence from [the claimant's] medical sources")]. Plaintiff contended that because there was no evidence that the ALJ made an attempt to obtain a functional assessment from a treating source, there was a gap in the record, and that because Dr. Echols, the consultative examiner, disagreed with treating sources' diagnosis of bipolar disorder, it appeared that Plaintiff was prejudiced by that gap.   [Doc. 9 at 10-12].   Plaintiff further suggested that Dr. Cosby or Ms. Williams would have been treating sources from whom the ALJ should have obtained the consultative report.   [*Id.* at 10].

The Commissioner, in response, argued that the regulations do not require the ALJ to request an opinion from a treating source instead of an agency consultative examiner, but rather, that the regulations simply require the ALJ to gather evidence from treating sources before deciding whether it is necessary to obtain additional consultative examinations.   [Doc. 10 at 10 (citing 20 C.F.R. §§ 404.1512(e) and 416.912(e))].   The agency contended that it complied with the regulations by requesting and receiving medical records from all of Plaintiff's treating sources and then requesting a consultative psychological examination in order to further develop the evidentiary record. [Doc. 10 at 10]. The Commissioner further argued that Plaintiff had failed to show that she suffered prejudice from any failure to request a treating-

34

physician evaluation of Plaintiff's function-by-function limitations—a showing the Commissioner contended Plaintiff was required to make before the Court could remand the case for further development of the record.  [*Id.* at 10-11 (citing *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997); *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995))].  The Commissioner additionally asserted that Plaintiff was represented by counsel at her ALJ hearing and before the Appeals Counsel and had the opportunity to request a consultative examination or submit additional evidence when she requested review by the Appeals Council, but she failed to do so.   [Doc. 10 at 11 [citing R209-10]].

After considering the arguments presented by the parties, the Court found that neither party had presented authority directly addressing the issue.  [Doc. 14 at 33-37]. The Court then discussed cases discovered in its own research and concluded, based on those cases, that the ALJ should have shown that he had attempted to obtain a function-by-function opinion of Plaintiff's limitations from a treating source prior to relying upon a consultative examination from a non-treating source.   [*Id.* at 37-42]. Accordingly, it reversed and remanded the case for further development of the record. [*Id.* at 42].

35

In her motion to alter or amend judgment, the Commissioner now raises a new argument: that the ALJ did not err in failing to order and consider a consultative examination from a treating source because none of the individuals who saw Plaintiff for her mental impairments was both a treating medical source and a person qualified to perform a consultative examination. [Doc. 16, *passim*]. She therefore contends that the "Court's Order and Opinion, insofar as it directed the ALJ to obtain a consultative examination from a treating source, constitutes error." [*Id*. at 2].

The Commissioner first points out that the regulations define "consultative examination" as a physical or mental examination or test the agency requests from "a treating source or another medical source." [*Id*. at 2 (quoting 20 C.F.R. § 416.919 (2013))]. The Commissioner then notes that the regulations further direct that consultative examinations may be obtained "only from a qualified medical source," which means that the medical source "must be currently licensed in the State and have the training and experience to perform the type of examination or test" the agency requests. [Doc. 16 at 3 (citing 20 C.F.R. § 416.919g (2013))]. The Commissioner also acknowledges that treating sources are generally the preferred sources for consultative examinations and states that the regulations define a "treating" medical source as a medical source who sees the claimant with a frequency consistent with accepted

36

medical practice for the type of treatment or evaluation required for the medical condition at issue.  [Doc. 16 at 3 (citing 20 C.F.R. §§ 416.902, 416.919h, 416.919i (2013); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam) ("[A] doctor who examines a claimant on only one occasion is not considered a 'treating physician.' "))].

The Commissioner then argues that, within the context of these regulations, none of the sources who saw Plaintiff for her mental impairments was both a "treating" medical source and a source "qualified" to perform a consultative examination, and thus, there is no treating source from which the ALJ might procure a consultative examination upon remand.  [Doc. 16 at 3-6].  The Commissioner asserts that there were two psychiatrists in the record, Dr. Kohrt and Dr. Cosby, who would be considered sources "qualified" to provide a consultative examination, but that they appear to have seen Plaintiff only once each, and therefore they were not "treating" sources. [*Id*. at 3 [citing R221, 369]].  The Commissioner also argues that although the record shows that Plaintiff saw Ms. Smith and Ms. Williams multiple times, [R233-34, 249, 327, 329, 331-34], the two-month span during which she saw Ms. Smith was too brief to establish a treating relationship, [*see* R233-34, 249], and in any case, Ms. Smith and Ms. Williams were not "qualified" medical sources from

whom the agency could seek a medical diagnosis through a consultative examination, as set forth in 20 C.F.R. § 416.919g(b).  [Doc. 16 at 4].  She points out that both Ms. Smith and Ms. Williams are Licensed Associate Professional Counselors ("LAPC") and asserts that pursuant to the Georgia code, an LAPC may practice professional counseling only under direction and supervision, and may provide counseling to assist people with identifying and resolving personal, social, vocational, intrapersonal, and interpersonal concerns, but may not render medical diagnoses. [*Id.* at 4-5 (citing O.C.G.A. §§ 43-10A-3(10), 43-10A-11(c))].  The Commissioner further contends that under 20 C.F.R. § 416.913(a), a school counselor is an acceptable medical source only for purposes of establishing intellectual disability, learning disabilities, and borderline intellectual functioning, which is far narrower than the scope of services requested of the consultative examiner here.  [Doc. 16 at 5 [citing R271 (requesting of Dr. Echols a consultative psychological status examination "comprising of medical history, diagnostic assessment of mental status, symptoms, mood and affect, behavior, daily activities, use of language and speech, and intellectual abilities (to include appropriate IQ, academic and perceptual-motor functioning testing)")]].

The Commissioner's argument is certainly one that could—and should—have been raised in its initial response brief.  It also begs the question of whether Dr. Dean

may properly be considered a treating medical source capable of performing the consultative examination requested of Dr. Echols.  [*See* R206-07, 346].

Regardless, the Court concludes that the Commissioner's motion is due to be granted.  From a procedural standpoint, by failing to respond to the motion, Plaintiff suggests that she does not have grounds to oppose it.  *See* LR 7.1B, NDGa (providing that failure to file a response to a motion "shall indicate that there is no opposition to the motion").

The motion is also persuasive on the merits.  First, the Commissioner appears to be correct in her assertion that the record contains no evidence indicating that Plaintiff had a "treating" relationship with Dr. Cosby or Dr. Kohrt within the context of the regulations.  Second, it appears that the Commissioner is also correct in her assertion that an LAPC opinion is not considered to be "an acceptable medical source."  *See Johnson v. Apfel*, No. CIV. A. 98-0674-AH-G, 2000 WL 208741, at *3 (S.D. Ala. Feb. 17, 2000) (holding that a licensed professional counselor is not an acceptable medical source under 20 C.F.R. § 416.913(a), and therefore a mental status report made by such a counselor was not entitled to weight afforded an acceptable medical source) (citing *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996) (holding that a nurse practitioner working without the supervision of a physician does not

39

constitute an "acceptable" medical source)); *see also Berkel v. Colvin*, Civ. Action File No. 1:12-CV-03558-AJB, 2014 WL 806864, at *11 (N.D. Ga. Feb. 27, 2014) (Baverman, M.J.) (discounting the evidentiary value of a GAF score, in part, because it was assigned by an LAPC rather than an "acceptable" medical source).  Third, while it appears possible that Dr. Dean was a treating medical source capable of providing the consultative examination, Plaintiff also does nothing to shed light on the extent of her treating relationship with Dr. Dean or to demonstrate that he has the credentials or capability to perform a consultative mental examination.  [*See* Dkt.].

For these reasons, the Court finds that Plaintiff has failed to show that there is a treating source who, upon remand, may properly provide a consultative mental examination.  Thus, while the Commissioner invited the Court's error by failing to raise the argument in its response to Plaintiff's appeal brief, the error is nevertheless clear.

The Commissioner's motion to alter or amend is therefore **GRANTED**, [Doc. 16], and the Court's Order and Opinion entered onto the record on August 28, 2013, is hereby **AMENDED** to hold that (1) the ALJ did not err by failing to procure a consultative mental examination from a treating medical source and that, (2) as a result, Plaintiff's second allegation of error provides no grounds for reversal, [*see* Doc. 14 at 33-42].

40

## VI.   CONCLUSION

For the reasons set forth above, the Commissioner's Motion to Alter or Amend Judgment, [Doc. 16], is **GRANTED**.  As discussed in Part V, *supra*, the Court's Order and Opinion entered onto the record on August 28, 2013, is hereby **AMENDED** to hold that the ALJ did not err by failing to procure a consultative mental examination from a treating medical source and that Plaintiff's second allegation of error therefore provides no grounds for reversal.  [*See* Doc. 14 at 33-42].

Nevertheless, because the Commissioner challenged only one of the Court's two grounds for reversing and remanding the decision of the Commissioner, the Order to **REVERSE** the decision of the Commissioner and **REMAND** the case for further proceedings remains in place, albeit with a reduced scope of reconsideration.  On remand, the ALJ shall (1) reconsider Plaintiff's functional limitations and credibility in light of the records—both favorable and unfavorable—from the Paine College Counseling and Wellness Center, (2) incorporate any new findings into the RFC assessment, (3) procure supplemental vocational-expert testimony as necessary, and (4) conduct any further proceedings made necessary by new findings. [*See id.* at 45-46, 49-52].

41

Additionally, the stay of the deadline for the response to Plaintiff's motion for attorneys' fees is hereby **LIFTED**.  (*See* Dkt. Entry, Nov. 12, 2013).  If the Commissioner objects to the motion for attorneys' fees, she is hereby **DIRECTED** to file a response brief within the **FOURTEEN DAYS** following the entry of this Order.[13]

**IT IS SO ORDERED and DIRECTED**, this the 31st day of March, 2014.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

---

[13]      Plaintiff may file a reply brief in accordance with Northern District of Georgia Local Rule 7.1C.

42